IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JOE DAVIS, III                                                    PLAINTIFF

V.                                    NO. 09-1032

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Joe Davis, III, brings this action pursuant to 42 U.S.C. §405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for a period of disability and disability insurance benefits

(DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI)

under Title XVI of the Act.  In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. §405(g).

## Procedural Background

Plaintiff filed his applications for DIB and SSI on September 7, 2007, alleging disability

since April 3, 2007.  (Tr.104-108, 111-113).  Plaintiff's applications were denied initially and

upon reconsideration.  (Tr. 50-51, 54-60, 67-70).  Pursuant to Plaintiff's request, a hearing was

held before an Administrative Law Judge (ALJ) on February 20, 2009, where Plaintiff, a

Vocational Expert (VE), and medical consultants Dr. Alice Cox and Betty Feir, Ph.D. testified.[1]

(Tr. 20-49).  On March 25, 2009, the ALJ entered his decision, denying Plaintiff's request for

---

[1]Dr. Cox testified via telephone.

a determination of disability. (Tr. 4-10) . The ALJ found that Plaintiff had the following severe impairments: left hip fracture status post hemiarthroplasty; history of squamous cell carcinoma of the larynx; chronic obstructive pulmonary disease (COPD); right shoulder arthritis; and low back pain. (Tr. 9 ). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and after careful consideration of the entire record, found that Plaintiff had the residual functional capacity (RFC) to perform light work[2] with certain limitations.[3] (Tr. 11). He found that Plaintiff would not be able to perform any past relevant work, but with the assistance of the VE, concluded that there were jobs in the national economy that Plaintiff could perform, such as janitorial worker, factory packager, and factory inspector. (Tr. 15). Plaintiff's request for review was denied by the Appeals Council on May 20, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 1-3).

**Evidence Presented**

Plaintiff was born in 1957 and graduated from high school. He previously worked as a laborer at a lumber mill for eleven years and then performed line work at a chicken plant for eleven years. On May 23, 2000, Plaintiff was diagnosed with a vocal cord lesion with hoarseness, and a Microlaryngoscopy and biopsy were performed by Dr. G. Carl Shipp, of The

---

[2]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. §416.967(b).

[3]The limitations set forth by the ALJ were: occasional overhead reaching with the right upper extremity; no noisy environment where the claimant would have to speak loudly or do much speaking; avoid exposure to extremes of heat; no balancing; no climbing ropes or scaffolds; avoid exposure to unprotected heights and dangerous moving machinery; and no driving as a condition of employment. (Tr. 11).

-2-

ENT Group.  (Tr. 286).  The pathology report found the lesion to be squamous cell carcinoma.

(Tr. 299).  The Plaintiff completed his radiation in August of 2000.  (Tr. 189).  Follow-up reports

by Dr. Shipp and Dr. James A. Hutcheson[4] of The ENT Group found that Plaintiff suffered from

hoarseness, and although Plaintiff had thickened cords bilaterally, they were mobile.  No further

lesions were found, and Plaintiff was reported as doing well. (Tr. 189, 191-196).  On October

9, 2003, x-rays of Plaintiff's chest revealed emphysema.  (Tr. 198).  On May 19, 2004, Dr.

Hutcheson reported that Plaintiff had been having problems working around feathers and dust

at his job, and recommended that he be moved away from those irritants.  (Tr. 192).

On January 31, 2005, Plaintiff was seen at Stamps Medical Clinic, complaining of left

hip numbness.  (Tr. 225).  He was found to have good lumbar range of motion and pain in his

left sciatica.

On June 24, 2005, Dr. David L. Whitt of The ENT Group reported that Plaintiff

complained of shortness of breath and was having difficulty breathing.  (Tr. 190).  Dr. Whitt

found that Plaintiff's hoarseness was secondary to his previous radiation therapy, and found no

evidence of a recurrent laryngeal tumor.  He opined that the shortness of breath was probably of

a cardiopulmonary origin.[5]  (Tr. 190).

On October 6, 2005, Dr. Hutcheson noted that Plaintiff was complaining of some

problems with his right shoulder, and on February 8, 2006, Plaintiff was seen at Stamps Medical

Clinic, complaining of a knot on his right shoulder.  (Tr. 187, 217).  On February 15, 2006,

---

[4]Dr. Shipp was noted to have left in a November 3, 2003 record, and Plaintiff thereafter began seeing Dr. Hutcheson.

[5]In a medical record dated February 10, 2009,  Plaintiff denied any shortness of breath or chest pain.  (Tr. 663).  Nor has he received treatment for any heart problems.

Plaintiff was seen by Dr. Clemens E. Soeller, of the Hope Bone and Joint Clinic, complaining of severe right shoulder pain.  Apparently, in his capacity as a line worker at a chicken plant, Plaintiff used a high-pressure hose to clean the floors, and as a result, had developed severe right shoulder pain.  (Tr. 202).  Dr. Soeller injected Plaintiff's right shoulder with Kenelog and Lidocaine, and as of March 1, 2006, stated that his pain had greatly improved.  (Tr. 207).  Plaintiff was able to fully move his shoulder with only mild pain.  (Tr. 207).  Dr. Soeller suggested that Plaintiff could return to his regular duties, but should limit lifting and pulling for about one week.  (Tr. 207).  After that, Dr. Soeller felt that he would be able to return to his full duties.

On April 19, 2006, Plaintiff presented himself to Stamps Medical Clinic, complaining of numbness in his left leg and pain at the hip site.  (Tr. 215).  He was reported as having good range of motion and his deep tendon reflexes were reported as good.  (Tr. 216).  On February 15, 2007, Plaintiff again presented himself to the Stamps Medical Clinic for follow up on his blood pressure and was complaining of hip pain.  (Tr. 211).  On April 19, 2007, a MRI of Plaintiff's lumbar spine was performed at Wadley Regional Medical Center.  (Tr. 273).  The impression was:

1.  Probable remote mild L1 vertebral body compression fracture.
2.  L4-5: mild intervertebral disc degeneration as evidenced by desiccation and minimal bulging.
3.  L5-S1: Moderate bilateral facet arthropathy.

(Tr. 273).

Beginning on May 9, 2007, as a result of Plaintiff's complaint of low back and bilateral lower extremity pain, Plaintiff received three epidural steroid injections at the Texarkana Surgery

-4-

Center.  (Tr. 246, 257, 268).  Plaintiff tolerated all three procedures well, and prior to the third injection, Plaintiff felt that his back pain had improved by approximately 60%.  (Tr. 246).  The record contains no evidence of any further treatment for Plaintiff's back.

On November 14, 2007, Plaintiff underwent a Spirometry Test, which resulted in a finding of mild obstruction.  (Tr. 329).  According to Plaintiff and Dr. Hutcheson, he saw Dr. Carlos Perez for his COPD, emphysema and pain.  However, none of Dr. Perez's notes are readable.[6]  (Tr. 305-325).

On November 14, 2007, a Physical RFC Assessment was completed by Ronald Crow.  (Tr. 335-342).  Dr. Crow found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull in an unlimited fashion.  (Tr. 335).  Dr. Crow further found that no postural, manipulative, visual, communicative or environmental limitations were established.   (Tr. 337-339).   Dr. Crow noted that the pulmonary disease/medicine clinic notes were unreadable, and also made extensive notes in explaining his findings.  For example, he noted that Plaintiff made no mention of back pain until the MRI was done in April of 2007; that after the steroid injections were given in Plaintiff's right shoulder, there was no further mention of his right shoulder as a problem in the longitudinal MER(medical evidence of record);  that as to Plaintiff's squamous cell carcinoma of the larynx, there was no evidence of recurrent disease; that Plaintiff continued to smoke;  that with respect to Plaintiff's

_____

[6]Since the transcript includes the Spirometry test, it is unnecessary for the Court to inquire further about Dr. Perez's records.  Furthermore, it is the Plaintiff's burden to prove his disability, by establishing a physical disability that has lasted at least one year and which prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  It does not appear that Plaintiff made any effort to obtain readable records from Dr. Perez and did not address them in his brief.

-5-

COPD, the current pulmonary function tests showed pre-BD FEV1 that was 79% of predicted; FEV1/FVC: 70 (85% of predicted).  Although Dr. Crow stated that the Plaintiff's activities of daily living were limited by an extensive list of alleged somatic and mental issues, he found that the medical evidence of record supported a finding of light RFC.[7]  (Tr. 342).

On March 1, 2008, Plaintiff was admitted to Wadley Regional Medical Center after having experienced what appeared to be an alcohol induced seizure.  (Tr. 364).  The medical assessment was:

1. Seizure, probably secondary to alcohol.
2. Alcohol abuse.
3. Hypokalemia.
4. Hypomagnesemia.
5. Thrombocytopenia.
6. Elevated LFT's
7. Dyslipidemia.
8. History of small cell carcinoma of the larynx.

(Tr. 366).  He was admitted to the PCU (progressive care unit) with "DT precautions" and discharged on March 4, 2008.  (Tr. 364-366).

On August 27, 2008, Plaintiff was involved in a motor vehicle collision and as a result, suffered a left femoral neck fracture.  (Tr. 371).  At that time, he denied any shortness of breath, chest pain, abdominal pain, fever or chills. X-rays (three views) of the lumbar spine, taken on August 27, 2008, showed mild anterior wedging of the L1 vertebral body.  However, this was present on the prior MRI and was felt to represent an old compression fracture.  There was no evidence of a new fracture, the interspaces were maintained, and there was no spondylolysis or

---

[7]The only "mental" issue referenced in the record is Plaintiff's history of alcohol abuse.  As will be more fully discussed later, there is no evidence of depression or any significant impact other than alcohol that would interfere with Plaintiff's ability to function.  (Tr. 31).

AO72A
(Rev. 8/82)

spondylolisthesis.  The "Impression" given was: mild remote superior end plate fracture of the L1 vertebral body and negative plain film evaluation for evidence of acute spinal injury.  (Tr. 428).  A left hip hemiarthroplasty was performed  that same day by Dr. Jeffrey T. Dehaan.  (Tr. 407).

On August 30, 2008, Plaintiff was transferred to Healthsouth Rehabilitation for physical therapy.  (Tr. 548).  On September 5, 2008, he was discharged from Healthsouth, and was reported as doing well.  Plaintiff's evaluation in team conference revealed ambulation was "200 feet standby assist with rolling walker, AKL standby assist to moderate independent." (Tr. 633). Subsequent follow-up visits to Dr. Dehaan resulted in reports that Plaintiff was doing fine and his hip looked good on x-ray.  On December 10, 2008, he was walking without any assistive devices.  (Tr. 658).  Although Plaintiff had a little limp, Dr. Dehaan thought he would get over it with time.  (Tr. 658).

On January 22, 2009, Plaintiff was reported as having a recent stroke and left sided weakness.  A CT angiogram of the carotid arteries was taken and interpreted by Dr. Khalid Malik.  (Tr. 667-672).  The impression was:

1.  Complete occlusion of the right internal carotid artery is noted just beyond the bifurcation.  This appears to remain occluded into the skull base.  Collateralization appears to provide flow to the right anterior cerebral and right middle cerebral arteries.
2.  The left common carotid artery demonstrates regions of stenosis in the mid course of the common carotid artery with a proximal lesion measuring approximately 50% in stenosis and a more distal lesion producing 80-85% stenosis.  Both of these are relatively short segment stenosis.
3.  The vertebral arteries and intracranial circulation is unremarkable in appearance with no evidence of significant focal stenosis or aneurysmal dilatation.
4.  The brain shows no significant change as compared to yesterday's CT examination of 1-21-09 with focal regions of acute infarction in the right basal ganglia and right corona radiata.

AO72A
(Rev. 8/82)

(Tr. 668).  Plaintiff also experienced left facial numbness and droop. (Tr. 669).

On February 10, 2009, Plaintiff was seen by Dr. Jeffrey D. DeCaprio at the request of Dr. Malik.  (Tr. 663).  Dr. DeCaprio found that Plaintiff had "complete occlusion of the right ICA and a 90% left common carotid artery stenosis."  (Tr. 663).  Plaintiff denied chest pain or shortness of breath.  At that time, Plaintiff was taking Triamterene/HCTZ, Aspirin, KlorCon, Simvastatin, MVI, and Albuterol, and continued to smoke one-third of a pack of cigarettes a day.  Dr. DeCaprio noted that Plaintiff was counseled for over 10 minutes about smoking cessation. (Tr. 663).  Dr. DeCaprio scheduled Plaintiff for a left subclavian carotid bypass.  (Tr. 665).

Prior to the carotid bypass surgery, a hearing was held before the ALJ on February 20, 2009.  (Tr. 20-49).  At the hearing, the ALJ heard from Dr. Alice Cox, a medical consultant, via telephone.  Dr. Cox stated that based on the objective evidence in the file, it was her opinion that Plaintiff did not meet or equal any of the exertional listings.  (Tr. 24-25).  Dr. Cox stated that she would put Plaintiff in the light category, but would also recommend that he not be required to speak loudly or continuously be exposed to fumes, ropes or scaffolds.  (Tr. 26-27).  Betty Feir, Ph.D., another medical consultant, testified that based upon the evidence in the file, Plaintiff would not meet or equal any of the non-exertional limitations.  (Tr. 29).

Plaintiff testified at the hearing that he lived in a house with his wife, who worked during the day.  (Tr. 31).  He stated that he helped her around the house and sometimes shopped with her at the store.  (Tr. 32).  He said that the last time he had a drink was March 1, 2008.  (Tr. 32). He testified that he had joint arthritis on both shoulders, which still bothered him.  However, he also testified that although there was arthritis on one side, his shoulder joints were "reasonably good."  (Tr. 43).  He stated that he could still drive a car, although not very far, and that he could

-8-

not do any yard work because of his hip and shoulder problems.  He also said that he had trouble going up and down stairs.  (Tr. 39).  He said that he still used a cane if he had to walk far, and that bending to the floor,  coming up from the floor, and lifting anything was hard.  (Tr. 40-41).  He said that the extremes of hot or cold weather bothered him.  Plaintiff admitted that he still smoked cigarettes, but stated that since his throat cancer, he had cut back to about six to eight cigarettes a day.  (Tr. 42).  He also testified that what really took him out of the job market was his hip.  (Tr. 43).

On February 23, 2009, Dr. DeCaprio performed the surgical procedure of "left subclavian carotid bypass" on the Plaintiff.  (Tr. 675).  Plaintiff tolerated the procedure well and was neurologically intact.  (Tr. 676).  On March 18, 2009, at a follow-up exam, Dr. DeCaprio noted that the incisions were well healed and that there were no neurological deficits.  (Tr. 666).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from

-9-

the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

-10-

**Discussion**

**A.  Plaintiff's Non-Exertional Impairment**

The ALJ found that Plaintiff's history of alcohol abuse did not cause more than minimal limitations in his ability to perform basic mental work activities and was therefore a nonsevere non-exertional impairment.  In making this determination, the ALJ considered the four broad functional areas set out in section 12.00C of the List of Impairments, known as "paragraph B" criteria.  Plaintiff testified that he took his last drink on March 1, 2008, and there is nothing in the record to indicate otherwise.  Nor is there any evidence in the record that Plaintiff is limited mentally in his daily activities, social functioning, or concentration, persistence of pace, when not abusing alcohol.  Dr. Feir's testimony at the hearing confirmed these conclusions.  At the hearing, Dr. Feir discussed Plaintiff's history of alcohol abuse and daily drinking, and since there was no evidence of any kind of rehabilitation, treatment, or freedom from alcohol abuse, she believed his alcohol abuse would be material.  However, when the ALJ asked Dr. Feir if Plaintiff were off alcohol completely and had been clean for a year, Dr. Feir said there would be no limitations whatsoever. On the other hand, if Plaintiff were on alcohol and drunk, Dr. Feir said he would not be able to function.  The Court finds there is substantial evidence to support the ALJ's finding that Plaintiff's history of alcohol abuse was a nonsevere non-exertional impairment.

**B.  Plaintiff's Exertional Impairments**

As stated earlier, the ALJ found that Plaintiff had the following severe impairments: left hip fracture status post hemiarthroplasty; history of squamous cell carcinoma of the larynx; COPD;   right shoulder arthritis; and low back pain.

-11-

### 1. Left Hip Fracture Status Post Surgery and Left Shoulder Arthritis

The ALJ found that neither the hip fracture status post surgery nor the left shoulder arthritis met listing 1.02,[8] resulting in Plaintiff's inability to ambulate or perform fine and gross movements effectively.  The regulations provide that to ambulate effectively, an individual must be "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, and have the ability to travel without companion assistance to and from a place of employment or school.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Examples of ineffective ambulation include:  the inability to walk without the use of a walker;  two crutches or two canes;  the inability to walk a block at a reasonable pace on rough or uneven surfaces;  the inability to use standard public transportation;  the inability to carry out routine ambulatory activities, such as shopping and banking;  and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  Id.

At the hearing, Plaintiff testified that he used one cane only if he had to walk a long distance.  This statement is supported by the medical records, which show that as late as December of 2008, Plaintiff's hip was doing fine, looked good on x-ray and that he was walking without any assistive devices.   Furthermore, there is no medical evidence to suggest that Plaintiff was unable to perform fine or gross movements effectively.  In fact, Plaintiff testified that his shoulder joints were "reasonably good now."

---

[8]1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.002b; or B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-12-

### 2.  Squamous Cell Carcinoma of the Larynx

The ALJ found that Plaintiff's history of squamous cell carcinoma of the larynx did not

meet listing 13.02.[9]  The record reflects that although Plaintiff did and still does experience

hoarseness, Plaintiff has been doing quite well since his surgery, and there has been no evidence

of a recurrent laryngeal tumor.  Additionally, although Plaintiff was counseled on numerous

occasions by different doctors to quit smoking, Plaintiff continues to smoke six to eight

cigarettes a day.

### 3.  COPD (Chronic Obstructive Pulmonary Disease)

The ALJ found that Plaintiff's COPD did not meet listing 3.02 because the Plaintiff did

not have an FEV1 value equal to or less than 1.25.[10]  Plaintiff is 5'5" and weighs 180 pounds.

(Tr. 128).  According to Table 1 of the CFR, his FEV1 value must be equal to or less than 1.25

and the Spirometry test conducted on November 14, 2007, revealed a FEV1 value as greater than

1.25. (Tr. 329).    Although the notes of the physician who treated Plaintiff for COPD were

unreadable, the Spirometry test provides the Court with sufficient medical evidence to conclude

that Plaintiff's COPD did not meet the listing.

### 4.  Low Back Pain

The ALJ found that Plaintiff's low back pain did not meet listing 1.04.[11]  The MRI of the

---

[9]13.02 Soft tissue tumors of the head and neck - A.  Inoperable or unresectable.  OR B.  Persistent disease following initial multimodal antineoplastic therapy.  OR C.  Recurrent disease following initial antineoplastic therapy, except local vocal cord recurrence....20 C.F.R. Pt. 404, Subpt. P, App. 1.

[10]3.02 Chronic pulmonary insufficiency .  A.  Chronic obstructive pulmonary disease, due to any cause, with the FEV equal to less than the values specified in table I corresponding to the person's height without shoes.

[11]1.04 Disorders of the spine or the spinal cord with: A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or...C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and

lumbar spine, performed on April 19, 2007, revealed the following:

> Findings: There is mild loss of superior end plate of L1.  However, no vertebral body
> edema noted and this probably represents a mild old compression fracture.  The L1-2,
> L2-3 and L3-4 discs, canal, and foramina are within normal limits.  At L4-5, there is
> diffuse disc desiccation with some minimal bulging.  No disc herniation.  No
> compromise of the canal or faromina.  L5-S-1 disc is normal.  Conus medullaris, cauda
> equina, and descending nerve roots are within normal limits.  Moderate facet arthropathy
> is seen at L5-S1 without evidence of lateral recess or foraminal stenosis.
> IMPRESSION:
> 1.  Probable remote mild L1 vertebral body compression fracture.
> 2.  L4-5: Mild Intervertebral disc degeneration as evidenced by desiccation and minimal
> bulging.
> 3.  L5-S1: Moderate bilateral facet arthropathy.

As stated earlier, later x-rays (three views) of the lumbar spine, taken on August 27,

2008, showed mild anterior wedging of the L1 vertebral body.  However, this was present on the

prior MRI and was felt to represent an old compression fracture.  There was no evidence of a

new fracture, the interspaces were maintained, and there was no spondylolysis or

spondylolisthesis.  There was no evidence of a compromise of the nerve root or nerve root

compression, spinal arachnoiditis, or an inability to ambulate effectively as required by Listing

1.04.  Furthermore, prior to Plaintiff's third steroid injection, his pain had improved by

approximately 60%.

**C. Consideration of all impairments**

Plaintiff contends that the ALJ did not consider all of the Plaintiff's impairments, or

consider the impairments in combination.  As discussed earlier, the ALJ carefully discussed all

of the impairments that he found to be severe, and explained why other impairments were not

severe.  He also found that the "severity of the claimant's impairments do not meet or equal any

---

resulting in inability to ambulate effectively, as defined in 1.00B2b.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

of these listings, nor do his impairments meet or equal any other listed impairment either in combination or alone." (Tr. 11).

Plaintiff suffered a stroke two to three weeks prior to the hearing, and Plaintiff contends that the ALJ did not take this into consideration when making his decision. The record reflects that the records from Dr. Jeffery DeCaprio, who performed the left subclavian carotid artery bypass surgery on February 23, 2009, were not submitted until March 25, 2009, the date of the ALJ's decision. At the hearing, Plaintiff testified that he was going to have a surgical procedure performed the following Monday to unblock an artery. However, Plaintiff's counsel did not inform the ALJ that he would be submitting records from this procedure, nor did he request additional time to submit such records. Nevertheless, the records are contained in the certified transcript, and reflect that Plaintiff tolerated the surgery well. At a follow-up visit on March 18, 2009, no neurological deficits were found. Although the ALJ may have erred when he found that there were no medical signs or laboratory findings in the record to substantiate the existence of a stroke as a physical impairment, even if the Plaintiff's stroke was considered a medically determinable impairment, it would not meet the 12 month durational requirement as required by 20 C.F.R., Part 404, Subpt. P, Appendix 1 (20 C.F.R. 404.1509). The Court finds that the ALJ sufficiently considered all of Plaintiff's impairments, alone and in combination.

**D. Plaintiff's Credibility**

Plaintiff contends that no "Polaski" evaluation was done. In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984), the Eighth Circuit Court of Appeals stated that the ALJ may discredit subjective complaints of pain if there are inconsistencies in the evidence as a whole. Id. The factors the ALJ should consider when determining if Plaintiff's complaints of pain are credible

-15-

include:  the absence of an objective medical basis that supports the severity of the subjective complaints; Plaintiff's daily activities; the duration, frequency and intensity of Plaintiff's pain; precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and functional restrictions.  Id.  If the ALJ discredits testimony and explicitly gives good reasons for doing so, the Court is bound by the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan,  956 F.2d 836, 841 ( 8th Cir. 1992).

The ALJ stated that he considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, "based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p."  Social Security Ruling 96-7p requires the ALJ to consider the same factors as those set forth in the Polaski case.  It is therefore clear that the ALJ assessed the credibility of Plaintiff's allegations properly.   Furthermore, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, and  recognized his obligation to evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited Plaintiff's ability to do basic work activities.  The ALJ also acknowledged that when the statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, he must make a finding on the credibility of the statements, based on a consideration of the entire case record.  (Tr. 12).

The ALJ considered Plaintiff's reported activities of daily living, including Plaintiff's ability to "piddle" around the house for about twenty minutes before he would run out of steam and need to go sit down and rest, his ability to drive, and his ability to sometimes shop with his

-16-

wife. Plaintiff stated that he could not do any yard work because of his hip and shoulder problems, had trouble going up and down stairs, used a cane if he had to walk far, and that it was hard for him to bend to the floor and come up and lift anything. Extremes of hot or cold weather also bothered him. While alleging generally limited activities of daily living, an ALJ is not obligated to accept all of the Plaintiff's assertions concerning daily activities. Ostronski v. Chater, 94 F.3d 413, 418-419 (8ᵗʰ Cir. 1996). Plaintiff also testified that he was taking Hydrocodone three times a week for pain. However, in a February 9, 2009 record, Plaintiff was reported as taking Triamterene/HCTZ, Aspirin, KlorCon, Simvastatin, MVI, and Albuterol. Additionally, the record does not reflect that Plaintiff complained of any side effects of the medication.

As indicated in the above discussion, the ALJ considered the medical data, history and effects of treatments and surgeries, activities of daily living, and all of Plaintiff's impairments and the medical records relating to those impairments. The ALJ need not methodically discuss each Polaski factor in a scripted fashion, so long as he acknowledged and considered those factors before discounting the Plaintiff's subjective complaints. See Forte v. Barnhart, 377 F.3d 892, 895 (8ᵗʰ Cir. 2004). The ALJ gave significant weight to the opinion of Dr. Alice Cox, who reviewed Plaintiff's medical records and addressed each severe impairment. Dr. Cox's opinion is consistent with other medical evidence in the record, as well as Dr. Crow's physical RFC assessment. In addition, the ALJ was allowed to consider Plaintiff's failure to stop smoking when making his credibility determination in this case, where Plaintiff had continued to smoke six to eight cigarettes a day. See Mouser v. Astrue, 545 F.3d 634, 638 (8ᵗʰ Cir. 2008).

**E. Residual Functional Capacity**

In making his determination that Plaintiff had the RFC to perform light work with certain exceptions, the ALJ reviewed the analysis given by Dr. Alice Cox, who noted that Plaintiff had a history of squamous cell carcinoma of the larynx, but since it had been stable, she did not think it was a particular issue in this case. In addition, although Plaintiff had been diagnosed with COPD, Dr. Cox noted that he continued to smoke, and that his pulmonary functions showed only mild obstruction. This, coupled with unremarkable chest x-rays, led her to conclude that the COPD was not a big issue. Dr. Cox addressed the hip replacement surgery, noting that his subsequent x-rays looked good and that he was doing well. Finally, she found that the MRI of the lumbar spine was not very impressive.

Dr. Betty Feir noted that Plaintiff had a history of alcohol abuse and daily drinking and that there was no evidence of any kind of rehabilitation or treatment, or any kind of period of freedom from alcohol abuse. However, Dr. Feir acknowledged that if Plaintiff was off alcohol completely and had been clean for a year, there would be no limitations. (Tr. 30). As stated earlier, Plaintiff testified that he had his last drink on March 1, 2008, and there is no evidence to indicate otherwise. Dr. Feir found no other evidence of depression or any significant impact other than alcohol that would interfere with his ability to function. (Tr.31).

The Court is of the opinion that there is substantial evidence to support the ALJ's finding that Plaintiff had the RFC to perform light work, and that the additional limitations set forth in the ALJ's opinion clearly reflected that Plaintiff would only be required to reach overhead with the right upper extremity, would not work around loud noise where the Plaintiff would have to speak loudly or where he would have to speak often, would avoid exposure to extremes of heat,

-18-

would not be required to balance, climb ropes or scaffolds, or be exposed to unprotected heights and dangerous moving machinery, and would not be required to drive. The Court finds that the ALJ's functional capacity determination was supported by substantial record evidence.

**E.  Vocational Expert**

The ALJ asked the VE to assume that an individual had a disability, as a younger aged individual, 49, currently 51; had a twelfth grade education; and had the same past relevant work history as Plaintiff. He added additional limitations:

> He would have occasional overhead reaching with his right upper extremity, but the left would not be limited; he should not be working in a noisy environment where he'd have to speak loudly or do much speaking whatsoever; he would not be required to work in extremes of heat as a condition of employment; there was a history in the past of possibly alcohol induced seizures, so seizure precautions should be introduced just to be on the safe side; he should not be required to balance, climb ladders, rope or scaffolds as a condition of employment; he should not work at unprotected heights or be around dangerous moving machinery; he should not drive as a condition of employment; and, assuming he would be off alcohol or drugs, there would be no additional limitations.

(Tr. 46). The VE testified that Plaintiff would not be able to return to any past work due to the lifting limitations, but that he would be able to perform janitorial work, factory packager work and factory inspector work. (Tr. 46). The ALJ further inquired about how much work on a month to month basis would be allowed to be missed on these jobs before an individual would be terminated. The VE stated that with respect to the janitorial work, the employer would tolerate about one day per month. However, with respect to the packager and inspector work, the VE said that only one day every other month would be tolerated. (Tr. 47).

The ALJ then proposed another hypothetical, asking the VE to assume that an individual was on the job and tired, could not concentrate or focus, was having side effects of medication, and needed to lie down, and determine whether that would be incompatible with any job. The

-19-

VE answered "That's correct."  (Tr.47).

The Court finds that the hypothetical questions posed to the VE accurately reflected Plaintiff's RFC as found by the ALJ. Therefore, the ALJ was entitled to rely upon the opinion of the VE that there were jobs in the national economy that Plaintiff could perform.

**Conclusion**

Based on the foregoing, and having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and  affirms the decision of the ALJ.

ENTERED this 1st day of June, 2010.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-20-